**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**NICOLE L.**

                    **Plaintiff,**

**v.**                                                    **6:20-CV-01576 (NAM)**

**KILOLO KIJAKAZI,**
**Acting Commissioner of Social Security,**[1]

                    **Defendant.**

_____

**APPEARANCES:**

Justin Goldstein
Kenneth Hiller
Law Offices of Kenneth Hiller
6000 North Bailey Avenue, Suite 1A
Amherst, NY 14226
_Attorney for Plaintiff_

Amelia Stewart
Social Security Administration
J.F.K. Federal Building, Room 625
15 New Sudbury Street
Boston, MA 02203
_Attorney for Defendant_

**Hon. Norman A. Mordue, Senior United States District Court Judge:**

                    **MEMORANDUM-DECISION AND ORDER**

**I.       INTRODUCTION**

        Plaintiff Nicole L. filed this action on December 17, 2020 under 42 U.S.C. § 405(g),

challenging the denial of her applications for Social Security Disability ("SSD") benefits and

---

[1] Plaintiff commenced this action against Andrew M. Saul, the former Commissioner of Social Security. (Dkt. No. 1).  Kilolo Kijakazi became the Acting Commissioner on July 9, 2021 and will be substituted as the named defendant in this action.  Fed. R. Civ. P. 25(d).

Supplemental Security Income ("SSI") under the Social Security Act. (Dkt. No. 1). After carefully reviewing the Administrative Record, ("R," Dkt. No. 8), the Court reverses the decision of the Commissioner and remands for further proceedings.

## II.   BACKGROUND

On July 31, 2018, Plaintiff filed applications for SSD and SSI benefits, alleging that she became disabled on September 17, 2017 due to the following conditions: 1) degenerative disc disease of the cervical spine; 2) cervical radiculopathy; 3) degenerative joint disease in the right shoulder; 4) tendonitis of the right shoulder; 5) myofascial pain syndrome; and 6) right carpal tunnel syndrome. (R. 251–52, 264–75, 297–98).

The claims were initially denied on November 16, 2018, and Plaintiff requested a hearing. (R. 98). On November 19, 2019, Plaintiff appeared and testified at a hearing before Administrative Law Judge ("ALJ") John P. Ramos. (R. 44–73). On December 27, 2019, ALJ Ramos issued a written decision denying Plaintiff's claims. (R. 12–28). The Appeals Council denied review, (R. 1–6), and Plaintiff then commenced this action. (Dkt. No. 1).

### A.  Plaintiff's Background and Testimony

Plaintiff was born in 1987 and was 30 years old as of the alleged onset date of disability. (R. 247). She has an eighth-grade education with special education services. (R. 252). She previously worked as a cashier, factory laborer, housekeeper, and Certified Nurse's Assistant. (R. 217–46, 253).

At the hearing, Plaintiff testified that she was unable to work due to pain in her neck and shoulder. (R. 57). Plaintiff said that she had received four sets of trigger point injections in the shoulder and took Gabapentin. (R. 56). Plaintiff also testified that she had been diagnosed with depression, anxiety, split personality disorder, bipolar disorder, and ADHD, but she had not

received any mental health treatment in seven years.  (R. 60).  She lived with her fiancée and two sons.  (R. 60–61).  Plaintiff testified that she had difficulty doing household chores, did not drive, and could not push a cart at the grocery store.  (R. 62).  Plaintiff testified that the pain in her shoulder and neck got worse with sitting for an extended time.  (R. 62).  She sometimes had difficulty grasping with her right hand because the fingers went numb.  (R. 64–65).

### B.  Medical Evidence

#### 1.  Treatment Records

On September 26, 2017, Dr. Nathanial Gould, M.D., a pain management specialist, treated Plaintiff for increased right shoulder pain radiating down the arm to the fingers.  (R. 389–92).  On examination, Dr. Gould noted: moderate tenderness of the right rotator cuff, biceps tendon, and lateral shoulder; and decreased abduction and flexion in the right shoulder; strength was 3/5 for right abduction, flexion, internal rotation, and external rotation.  (R. 390–91).  Neer's, Hawkin's, Empty Can, and Speeds tests (used to diagnose shoulder injuries) were positive on the right.  (R. 391).

On September 28, 2017, Plaintiff received physical therapy for right shoulder pain.  (R. 326–28, 353–57).  She was working as a cleaner at an apartment complex.  (R. 327).  She reported that: 1) she could barely lift her arm; 2) she had tingling down her arm into her hand with hand swelling; 3) she was recently fired due to her shoulder pain interfering with her work; 4) she had constant pain ranging from 4/10 to 10/10; 5) aggravating factors included repetitive motions, overhead motions, and lifting any weight; and 6) a half-full coffee pot was the heaviest item she could lift.  (R. 327).  Exam findings showed: decreased right shoulder range of motion; strength ranging from 3/5 to 4/5 in the right shoulder; Shoulder Pain and Disability Index ("SPADI") of 80.76% disability due to shoulder pain; poor posture; and tenderness to touch in

the right scapular region and right upper trapezius.  (R. 327–28).  Plaintiff received additional physical therapy on October 9, 2017.  (R. 329–30).

On December 28, 2017, Plaintiff returned to Dr. Gould's office and received treatment from Leah Webster, a Registered Physician Assistant – Certified ("RPA-C").  (R. 385–88).  Plaintiff reported that she had attended physical therapy visits, and the pain caused her to vomit.  (R. 385).  Plaintiff said that sleeping, overhead activities, and hot showers made her pain worse.  (R. 385).  Exam findings included: generalized cervical spine tenderness; moderate tenderness of the right cervical paraspinals, upper trapezius, and rhomboids; moderate tenderness of the right rotator cuff, biceps tendon, and lateral shoulder; decreased abduction and flexion in the right shoulder; and strength was 3/5 for right abduction, flexion, internal rotation, and external rotation.  (R. 386).  Neer's, Hawkin's, Empty Can, and Speeds tests were positive on the right.  (R. 387).

On January 17, 2018, Dr. John Sullivan, M.D. and RPA-C Webster treated Plaintiff for right shoulder pain and neck pain.  (R. 382–84).  Plaintiff reported shoulder and neck pain radiating down the right arm with weakness and numbness, and that physical therapy made her pain worse.  (R. 382).  Exam findings included: generalized cervical spine tenderness; moderate tenderness of the right cervical paraspinals, upper trapezius, and rhomboids; moderate tenderness of the right rotator cuff, biceps tendon, and lateral shoulder; decreased abduction and flexion in the right shoulder; and strength was 3/5 for right abduction, flexion, internal rotation, and external rotation.  (R. 383).  Neer's, Hawkin's, Empty Can, and Speeds tests were positive on the right.  (R. 383).  Plaintiff was referred for a neck consultation.  (R. 384).

On March 6, 2018, Dr. Gould treated Plaintiff for neck pain radiating to the right shoulder, arm, and fingertips.  (R. 332–35, 461).  She reported that the pain was aggravated by

almost all movements, being in any position for too long, bending backward or forward, and twisting. (R. 332). She had loss of sensation, tingling, and weakness in her arms. (R. 332). Exam findings included: mild tenderness of the right and left cervical paraspinals and rhomboids; moderate tenderness of the right and left upper trapezius; mildly reduced neck flexion, side-bending left, and left rotation; and markedly reduced extension and right rotation. (R. 333). Right shoulder range of motion was limited, and strength was 4/5 on the right. (R. 334). On March 22, 2018, Plaintiff received trigger point injections in the right upper trapezius for myofascial pain syndrome. (R. 339, 460).

On March 28, 2018, Plaintiff returned to Dr. Gould's office and was seen by Dr. Thang Q. Le, M.D. for worsening cervical spine and right shoulder pain. (R. 336–38, 458–59). On exam, Plaintiff was unable to elevate her right upper arm over 90 degrees, she had decreased range of motion of the cervical spine, and she had tenderness in the right paracervical muscle. (R. 337, 458). Dr. Le assessed Plaintiff with cervical radiculopathy and noted that she required pain management and physical therapy. (R. 458–59).

On April 5, 2018, Dr. Gould and Family Nurse Practitioner ("FNP") David Campola treated Plaintiff for neck and shoulder pain that was aggravated by any movement. (R. 340–43, 457). Plaintiff reported that her trigger point injections wore off after one week. (R. 340). Exam findings included: moderate cervical paraspinal tenderness; marked right shoulder trapezius tenderness; mild tenderness of the left cervical paraspinals and upper trapezius; moderate tenderness of the right rotator cuff and biceps tendon; limited range of motion for the right shoulder; and 4/5 strength on right internal rotation. (R. 341–42). Plaintiff was prescribed Gabapentin and scheduled for additional trigger point injections. (R. 342).

On June 1, 2018, Plaintiff returned to Dr. Gould's office for treatment of neck and right shoulder pain. (R. 344–47, 456). Plaintiff reported that her pain was aggravated by almost all movements, and it was relieved with rest and medication. (R. 344). On exam, Plaintiff had tenderness throughout the cervical paraspinals and trapezius. (R. 345). On June 8, 2018, Plaintiff received trigger point injections in the bilateral upper trapezius and right rhomboids. (R. 348–49, 455).

On June 29, 2018, Plaintiff saw Dr. Le about continued pain in the cervical spine. (R. 350–52, 368–70, 454). She reported pain radiating down the right hand, having difficulty opening things, numbness in the hand, and sometimes dropping small things. (R. 350). On exam, Plaintiff had decreased range of motion of the cervical spine and tenderness of the right shoulder. (R. 351). On July 24, 2018, Plaintiff saw Dr. Gould and reported right-sided neck pain radiating into the right arm and intermittent tingling and sensory deficit in the right hand. (R. 479). Exam findings included: 5/5 grip strength bilaterally; 5/5 elbow flexion bilaterally; 5/5 extension bilaterally with pain at the anterior right shoulder; positive Spurling's test on the right shoulder; and negative Tinel's tests. (R. 479).

On September 20, 2018, Dr. Michael McNulty, M.D. and FNP Campola treated Plaintiff for constant neck pain ranging from 7/10 to 10/10. (R. 364–67, 452). Plaintiff reported that her pain was aggravated by almost all movements, and that she had no relief from the trigger point injections in June 2018. (R. 364). Exam findings included: marked tenderness of the bilateral cervical paraspinals and right upper trapezius; and Phalen's test was positive bilaterally at the wrist/hand. (R. 365). Plaintiff was assessed with myofascial pain syndrome (deteriorating) and cervicalgia (unchanged). (R. 366). Plaintiff was referred for physical therapy and prescribed additional Gabapentin. (R. 366).

On October 15, 2018, Plaintiff returned to Dr. Gould's office and her complaints and assessment were largely the same. (R. 658–62). She had marked tenderness of the left cervical paraspinals and upper trapezius. (R. 660). On November 23, 2018, Plaintiff underwent physical therapy. (R. 527–33). She reported pain at 4/10 to 10/10 and disturbed sleep. (R. 529–30). Exam findings included: limited cervical spine range of motion; 3/5 to 5/5 strength in the right shoulder; tenderness to palpation of the right bicipital groove, subacromial, deltoid insertion, upper trapezius, rhomboids, infraspinatus, and teres; and limited active range of motion for the right shoulder. (R. 530–31). She was assessed with active limitations regarding self-care, mobility, and household tasks. (R. 532).

On January 9, 2019, Plaintiff returned to Dr. Gould's office complaining of constant neck pain radiating to the right shoulder down to the hand, as well as tingling and weakness in the right hand, and dizziness. (R. 558–62). On exam, Plaintiff had marked tenderness of the right cervical paraspinals, upper trapezius, and rhomboids. (R. 560). Sensory testing was reduced in the right thumb and radial forearm. (R. 561). In the assessment, FNP Campola noted that Plaintiff had "chronic, severe right neck and right upper extremity pain with diffuse referred pain through the right upper extremity and right hand." (R. 561). FNP Campola also noted "suspect cervical facet strain," and "possible labral injury, supraspinatus tendinosis but shoulder MRI showed only tendinosis of the supraspinatus." (R. 561). Plaintiff was continued on Gabapentin and offered additional injections. (R. 562).

On May 2, 2019, Plaintiff went to Dr. Gould's office and reported neck and shoulder pain at 8/10, with symptoms exacerbated by activity and using the right arm. (R. 651–57). She had tingling in the fingers of the right hand and weakness. (R. 653). On exam, Plaintiff had severe pain to palpation of the right cervical paraspinals and right upper trapezius. (R. 653).

On June 25, 2019, Dr. Gould treated Plaintiff for persistent neck pain and completed paperwork for Workers' Compensation. (R. 639–44). Plaintiff reported that while working as a housekeeper for a hotel in 2017 she injured her right shoulder and neck from repetitive motions after two years of cleaning and taking out garbage. (R. 641). Exam findings included: 4/5 strength for right hand grip and right wrist and elbow extension and flexion; moderate reduction of range of motion for the neck in all directions; severe tenderness in right shoulder rotator cuff; limited range of motion for the right shoulder; and that a Spurling's test caused pain to radiate into the right shoulder. (R. 642).

On September 14, 2019, Plaintiff went to the Emergency Department of the hospital for right neck and arm pain that was so bad that she was vomiting and could not move her arm. (R. 522–27). Her symptoms were consistent with chronic radicular pain and cervical radiculopathy. (R. 525). She was advised to continue taking Gabapentin, Tylenol, and Ibuprofen and consult with her chronic pain specialist. (R. 525). On September 26, 2019, Plaintiff went to Dr. Gould's office and reported severe pain in the right neck, shoulder, and hand. (R. 599–609). Plaintiff said she was unable to take Gabapentin three times daily due to fatigue. (R. 599). She reported headaches, and numbness and weakness in the right arm. (R. 599). Exam findings included: moderate to severe pain to palpation of the neck; positive Spurling's sign on the right; and limited range of motion for the right shoulder. (R. 601–02). Plaintiff was continued on Gabapentin, prescribed Lidocaine patches, and offered injections. (R. 604).

On October 14, 2019, Plaintiff saw Dr. Gould and reported severe pain in the neck, right shoulder, and arm that caused her to vomit. (R. 588–99). She was working doing laundry, and this was very painful. (R. 588). She had headaches, right arm numbness and weakness, and she was unable to take Gabapentin three times per day due to fatigue. (R. 588). Exam findings

included: 4/5 grip strength on the right; moderate cervical paraspinal tenderness; severe upper trapezius and rhomboids tenderness; moderately reduced extension and bilateral extension in the neck; and limited range of motion for the shoulder.  (R. 590).   She was continued on Gabapentin and Lidocaine patches.  (R. 593).

### 2.   Imaging Studies

On January 12, 2018, an MRI of Plaintiff's right shoulder showed "tendinosis of the supraspinatus component" which appeared slightly more pronounced in comparison to an MRI from November 4, 2016.  (R. 383–84, 465–66).  An MRI of the cervical spine showed "stable minimal anterolisthesis C2 over C3 and disc degenerative changes with mild disc bulging" at C3–4, C4–5, and C5–6.  (R. 384, 467–68).  Dr. Gould noted that the MRI of the right shoulder showed "tendinosis of the supraspinatus," and the MRI of the cervical spine showed "C3/4, C4/5 small broad-based disc bulge with loss or lordosis."  (R. 334).

On July 24, 2018, an NCV/EMG (Electromyography and Nerve Conduction Velocity) study showed electrodiagnostic evidence of a "borderline right median neuropathy at the wrist." (R. 479–83).

### 3.   Opinion Evidence

On October 10, 2018, Plaintiff was examined by State agency consultant Kautilya Puri, M.D. (R. 490–93).  Among other things, Dr. Puri found that: Plaintiff's cervical spine showed "decreased flexion, extension, lateral flexion 35 degrees with decreased rotary movement 60 degrees with local tenderness"; her lumbar spine was normal; and she had full range of motion of the shoulders except for right shoulder which had generalized decreased range of motion 5–10 degrees to all modalities with local tenderness.  (R. 492).  Plaintiff had 5/5 strength in the upper and lower extremities.  (R. 49).  Dr. Puri diagnosed multiple joint pain secondary to degenerative

joint disease and history of right carpal tunnel syndrome.  (R. 492).  Dr. Puri assessed that
Plaintiff "did not have any objective limitations to communication, fine motor, or gross motor
activity," and "[m]ild limitations to her activities of daily living on examination today with mild
limitations to overhead reaching and lifting weights."  (R. 492).

On November 15, 2018, non-examining State agency consultant, Gary Ehlert, M.D.
assessed that Plaintiff was able to perform a range of light work with a limitation for only
occasional overhead reaching on the right side due to right shoulder tendinosis, reduced range of
motion, and pain; Dr. Ehlert also assessed exertional and postural limitations due to degenerative
disc disease of the cervical spine and right shoulder tendinosis.  (R. 80–83, 93–98).

On June 25, 2019, Dr. Gould assessed that Plaintiff had 40% loss of active flexion of 90
degrees of the shoulder, 10% loss for moderate extension, and 7.5% loss for mild adduction,
with overall "57.5% loss of the right arm."  (R. 639–40).  Dr. Gould found that she had the
ability to occasionally lift/carry and push/pull 20 pounds but never lift, carry, push, or pull on a
frequent basis.  (R. 640).  She could also: frequently sit, stand, and walk; frequently perform
simple grasping, fine manipulation, reach at/or below the shoulder level; frequently drive a
vehicle and operate machinery; and occasionally reach overhead.  (R. 640).

On October 14, 2019, Dr. Gould completed a medical source statement.  (R. 544–46).
Dr. Gould noted that Plaintiff had received treatment at his office since March 6, 2018 for neck
pain, myofascial pain, shoulder pain, and tendinosis.  (R. 544).  Dr. Gould found the following
limitations: Plaintiff could sit for about 4 hours and stand/walk for at least 6 hours in an 8-hour
working day with normal breaks; she required unscheduled breaks; she could occasionally
lift/carry up to 20 pounds; she could not frequently lift/carry any weight; she could occasionally
look down (sustained flexion of neck) and rarely turn head right or left, look up, or hold head in

static position; she could occasionally use her hand to grasp, turn, or twist objects; she could occasionally use her fingers for fine manipulations; and she could rarely reach with her arms, including overhead.  (R. 545–46).

According to Dr. Gould, Plaintiff's impairments would cause good days and bad days, she would likely be absent from work due to her impairments or treatment about three days per month on average, and she would frequently experience pain or other symptoms severe enough to interfere with attention/concentration needed to perform even simple work tasks.  (R. 546).

On November 26, 2019, Plaintiff saw Dr. Richard Mutty, M.D. for an independent orthopedic evaluation.  (R. 666–74).  Plaintiff reported neck pain radiating towards the right shoulder in the trapezius region in the vertebral border of the scapula, paresthesias (tingling) in the right hand, and dropping things.  (R. 667).  On exam, Plaintiff was "quite tender at the base of the neck to the right of the midline extending to the proximal trapezial region along the vertebral body of the scapula."  (R. 668).  In addition, range of motion of her neck was limited, and there was diffuse tenderness in the trapezial region.  (R. 668).  Dr. Mutty found that Plaintiff's range of motion was markedly limited with the pain being experienced posteriorly and superiorly in the trapezial and scapular region.  (R. 668).  Abduction, flexion, internal rotation, and external rotation were limited.  (R. 668).

Dr. Mutty diagnosed Plaintiff with "neck sprain with radicular complaints and C3–C4 and C4–C5 disc bulging," and right shoulder tendinosis.  (R. 669).  Dr. Mutty assessed that Plaintiff's functional capacity/exertional abilities "would place her at the light work level with a 10lb. weight restriction on an occasional basis."  (R. 669).  In a separate form, Dr. Mutty assessed that Plaintiff could: occasionally lift/carry 20 pounds; occasionally pull/push 10 pounds; frequently sit, stand, and walk; occasionally climb, kneel, bend/stoop/squat, and reach

overhead; occasionally drive a vehicle and operate machinery; and frequently perform simple

grasping, fine manipulation, and reach at/or below shoulder level.  (R. 672).

### C.  ALJ's Decision Denying Benefits

At step one of the five-step evaluation process, the ALJ determined that Plaintiff had not

engaged in substantial gainful employment since September 17, 2017, the alleged onset date of

disability.  (R. 18).  At step two, the ALJ determined that Plaintiff had the following "severe"

impairments: 1) degenerative disc disease of the cervical spine; and 2) degenerative joint disease

in the right shoulder.  (R. 18) (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

At step three, the ALJ found that Plaintiff "does not have an impairment or combination

of impairments that meets or medically equals the severity of one of the listed impairments in 20

C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526,

416.920(d), 416.925 and 416.926)."  (R. 19).

At step four, the ALJ determined that Plaintiff had the residual functional capacity

("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b), with the following

additional limitations:

> Claimant can frequently climb ramps or stairs, balance,
> stoop (i.e., bending at the waist), kneel, crouch, and crawl.
> The claimant should never climb ladders, ropes or scaffolds.
> [She] should never reach overhead with [her] right arm and
> should not be exposed to vibrations, unprotected heights or
> dangerous machinery

(R. 19).

Next, the ALJ found that Plaintiff had no past relevant work.  (R. 22).  The ALJ noted

that Plaintiff was 30 years old on the alleged disability onset date, she had a limited education,

and she was able to communicate in English.  (R. 22).  The ALJ then asked a vocational expert

whether "jobs exist in the national economy for an individual with the claimant's age,

education, work experience, and residual functional capacity." (R. 23).  The vocational expert

responded that such jobs included inspector, hand packager, final assembler, and odd piece

checker.  (R. 23).  Based on this testimony, the ALJ concluded that considering Plaintiff's age,

education, work experience, and RFC, she was "capable of making a successful adjustment to

other work that exists in significant numbers in the national economy."  (R. 24).  Consequently,

the ALJ found that Plaintiff was not disabled.  (R. 24).

## III.    STANDARD OF REVIEW

### A.    Disability Standard

To be considered disabled, a claimant must establish that she is "unable to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).  In

addition, the claimant's impairment(s) must be "of such severity that she is not only unable to do

her previous work but cannot, considering her age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §

1382c(a)(3)(B).

The Social Security Administration uses a five-step process to evaluate disability claims:

> First, the Commissioner considers whether the claimant is currently
> engaged in substantial gainful activity.   If she is not, the
> Commissioner next considers whether the claimant has a "severe
> impairment" which significantly limits her physical or mental
> ability to do basic work activities.  If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which meets or equals the
> criteria of an impairment listed in Appendix 1 of the regulations.  If
> the claimant has such an impairment, the Commissioner will
> consider her [*per se*] disabled . . . .  Assuming the claimant does not
> have a listed impairment, the fourth inquiry is whether, despite the
> claimant's severe impairment, she has the residual functional

13

factors: supportability; consistency; relationship with the claimant; specialization; and "other

factors." 20 C.F.R. §§ 404.1520c(a)–(c), 416.920c(a)–(c).  The ALJ is still required to

"articulate how he considered the medical opinions" and "how persuasive he finds all of the

medical opinions." *Id.* at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1).  The two "most

important factors for determining the persuasiveness of medical opinions are consistency and

supportability," and an ALJ is required to "explain how he considered the supportability and

consistency factors" for a medical opinion.  *Id.* at §§ 404.1520c(b)(2), 416.920c(b)(2).

## IV.   DISCUSSION

Plaintiff challenges the ALJ's decision to deny her SSD and SSI benefits on the grounds

that the ALJ failed to identify substantial evidence to support Plaintiff's RFC and erred in his

analysis of the medical opinions.  (Dkt. No. 12, p. 1).  In response, the Commissioner counters

that the ALJ properly evaluated the evidence when formulating the RFC.  (Dkt. No. 16, p. 1).

### A.  Dr. Gould's Opinions

On close inspection, the main dispute in this case concerns the ALJ's analysis of the

opinions of Dr. Gould, Plaintiff's pain management specialist.  On June 25, 2019, Dr. Gould

examined Plaintiff and assessed that she had the ability to: occasionally lift/carry and push/pull

20 pounds; never lift, carry, push, or pull on a frequent basis; frequently sit, stand, and walk;

occasionally reach overhead; and frequently perform simple grasping, fine manipulation, reach

at/or below shoulder level, drive a vehicle, and operate machinery.  (R. 639–40).  Plaintiff had

40% loss of active flexion of 90 degrees of the shoulder, 10% loss for moderate extension, and

7.5% loss for mild adduction, with overall "57.5% loss of the right arm."  (*Id.*).

On October 14, 2019, Dr. Gould gave a more restrictive opinion, which included the

following limitations: she could sit for about 4 hours and stand/walk for at least 6 hours in an 8-

hour working day with normal breaks; she required unscheduled breaks; she could occasionally

lift/carry up to 20 pounds; she could not frequently lift/carry any weight; she could occasionally

look down; she could rarely turn her head right or left, look up, or hold her head in static

position; she could occasionally use her hand to grasp, turn, or twist objects; she could

occasionally use her fingers for fine manipulations; and she could rarely reach with her arms,

including overhead.  (R. 545–46).

The ALJ found Dr. Gould's opinion dated June 25, 2019 to be "more persuasive"

because it was "consistent with the record and with Dr. Ehlert's opinion."  (R. 22).  The ALJ

noted that Dr. Gould's assessment that Plaintiff could occasionally lift/carry 20 pounds was

consistent with Dr. Ehlert's opinion.  (R. 22).  Further, the ALJ stated that Dr. Gould's

assessment was consistent with Plaintiff's MRI results, which showed tendinosis of the

supraspinatus in the right shoulder and degenerative changes and mild disc bulging in the

cervical spine.  (R. 22).

As for Dr. Gould's opinion dated October 14, 2019, the ALJ found this assessment to be

"less persuasive" because it was "not consistent with the claimant's reported activities,

medications, clinical findings, and the other medical opinions."  (R. 21).  According to the ALJ,

there was no evidence in the record to support Dr. Gould's assessment that Plaintiff would

likely be absent from work about three days per month and could only sit for about four hours.

(R. 22).  The ALJ also noted that Dr. Gould's assessment that Plaintiff could only occasionally

stoop was "not consistent with [her] loading washers and dryers at her job."  (R. 22).

Plaintiff argues that the ALJ "failed to provide a rationale as to why the June 2019

opinion is more supported or more consistent with the record than the October 2019 opinion."

(Dkt. No. 12, p. 21).  In general, when analyzing a doctor's medical opinion, an ALJ is required

to "explain how [he] considered the supportability and consistency factors."  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).  With respect to "supportability," the Regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  *Id.* at §§ 404.1520c(c)(1), 416.920c(c)(1).  The Regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  *Id.* at §§ 404.1520c(c)(2), 416.920c(c)(2).

Here, the ALJ discussed the consistency of the June 25, 2019 opinion, but he did not provide any explicit analysis of its supportability.  (R. 22).  For example, the ALJ opined that Dr. Gould's assessment was consistent with MRI results, but he did not indicate whether Plaintiff's other test results and exam findings supported the assessment.  The Commissioner argues that the ALJ "implicitly addressed the supportability factor when evaluating Dr. Gould's June 2019 opinion," pointing to clinical findings referenced in the consistency analysis.  (Dkt. No. 16, pp. 8–9).  But without some clear discussion of the supportability factor the Court is left to guess at the ALJ's reasoning, which frustrates meaningful review.

The ALJ's analysis of the October 14, 2019 opinion also falls short regarding the supportability factor.  Although the ALJ discussed the supportability of certain limitations assessed by Dr. Gould, he completely ignored others.  For example, the ALJ stated that the limitations for absences from work and sitting down were not supported by medical evidence.  (R. 22).  However, the ALJ did not discuss the supportability of Dr. Gould's assessment that

Plaintiff could: occasionally look down; rarely turn her head right or left, look up, or hold her head in static position; occasionally use her hand to grasp, turn, or twist objects; occasionally use her fingers for fine manipulations; and rarely reach with her arms.  These limitations were key to Plaintiff's claim, and there is ample evidence in the record to support them, i.e. repeated findings of tenderness, limited range of motion, and positive Spurling's tests (used to diagnose a pinched nerve in the neck).

Moreover, there was evidence that Plaintiff's condition worsened in the period between the June 25, 2019 opinion and the October 14, 2019 opinion.  The record shows that Plaintiff went to the Emergency Department on September 14, 2019 for severe pain in the neck and shoulder, and she told Dr. Gould on September 26, 2019 that her pain was so bad that it caused her to vomit.  (R. 522–27, 599–609).  On exam, Plaintiff had moderate to severe pain to palpation of the neck, Spurling's sign was positive on the right, and right shoulder range of motion was limited.  (R. 601–02).  Plaintiff was continued on Gabapentin and prescribed Lidocaine patches.  (R. 604).  The ALJ did not discuss these records with respect to the supportability of Dr. Gould's October 14, 2019 opinion, which further undermines the analysis.

**B.  Residual Functional Capacity**

Relatedly, Plaintiff argues that the ALJ erred because the RFC did not include several limitations assessed in Dr. Gould's October 14, 2019 opinion.  (Dkt. No. 12, pp. 19–22).  Plaintiff notes that the ALJ did not adopt any limitations for neck movement, despite Dr. Gould's finding that she could only occasionally look down and rarely turn her head right or left, look up, or hold her head in static position.  The ALJ also did not adopt any limitations for hands and fingers, while Dr. Gould assessed that Plaintiff could only occasionally use her right hand to grasp, turn, or twist objects and occasionally use her fingers for fine manipulations.  As

discussed above, the ALJ did not discuss the supportability of these limitations—an error which necessarily affected his formulation of the RFC.

The Commissioner argues that the RFC is nonetheless supported by Dr. Gould's less restrictive opinion dated June 25, 2019 and the opinion of Dr. Ehlert, the State agency reviewing physician. (Dkt. No. 16, p. 10). But the ALJ did not address the supportability of the June 25, 2019 opinion, as discussed above, and Dr. Ehlert did not examine Plaintiff. Under the circumstances, these opinions do not amount to substantial evidence for the RFC.

Finally, Plaintiff contends that the RFC failed to address the impact of her carpal tunnel syndrome. (Dkt. No. 12, p. 16). The ALJ found at Step 2 of his analysis that Plaintiff's carpal tunnel syndrome did not constitute a severe impairment because there were "no reports of symptoms of this impairment that would impair her ability to work." (R. 18). But the record contains numerous reports that Plaintiff complained of numbness and tingling in her right hand, which are serious and limiting symptoms of carpal tunnel syndrome. (*See* R. 327, 332, 350, 382, 479, 558–62, 588, 599). Thus, the ALJ mischaracterized the record.

The Commissioner argues that any such error was harmless because "the ALJ considered Plaintiff's carpal tunnel syndrome in the RFC portion of the decision." (Dkt. No. 16, p. 16). The Court is not convinced. The ALJ briefly mentioned evidence of electrodiagnostic testing that showed "borderline right median neuropathy at the wrist," as well as tests that showed Plaintiff's hand and finger dexterity and grip strength were intact. (R. 20–21). But because the ALJ did not consider Plaintiff's carpal tunnel syndrome impairment to be severe, his analysis went no further. For example, the ALJ did not specifically address the opinion of Dr. Gould that she could only occasionally use her hand to grasp, turn, or twist objects and occasionally use her fingers for fine manipulations. (R. 545–46). Although the ALJ found Dr. Gould's opinion to be

less persuasive overall, the reasons he gave for doing so do not directly bear on carpal tunnel syndrome.  In sum, the ALJ's error compromised the rest of his analysis and the resulting RFC.

### C.  Remedy

In general, remand is appropriate for Social Security claims when further findings and development of the record would help to assure proper disposition of the claims.  *See Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999).  As discussed above, the ALJ's decision was flawed with respect to Dr. Gould's opinions and Plaintiff's carpal tunnel syndrome.  Consequently, remand is necessary for the ALJ to reconsider Dr. Gould's opinions and Plaintiff's overall RFC. *See Andrew G. v. Commr. of Soc. Sec.*, No. 19-CV-942, 2020 WL 5848776, at *6–9; 2020 U.S. Dist. LEXIS 182212, at *18–27 (N.D.N.Y. Oct. 1, 2020) (remanding due to the ALJ's failure to adequately explain the supportability or consistency factors that led to her decision).

## V.    CONCLUSION

For these reasons, it is

**ORDERED** that the decision of the Commissioner is **REVERSED AND REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for proceedings consistent with this Memorandum-Decision & Order; and it is further

**ORDERED** that the Clerk amend the caption to substitute KILOLO KIJAKAZI, Acting Commissioner of Social Security, for Defendant ANDREW M. SAUL, the former Commissioner of Social Security; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

Date:   January 18, 2022
        Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge

20